1

2

3

4

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

5

6

7

8

9

10

11

12

13

| | |
|---|---|
| PERI & SONS FARMS, INC.,<br>a Nevada corporation, | ) <br> ) <br> )    3:11-cv-00757-VPC |
| Plaintiff, | ) <br> ) |
| v. | )    **ORDER** <br> ) |
| JAIN IRRIGATION, INC., a corporation,<br>and AGRI-VALLEY IRRIGATION,<br>INC., a corporation, | ) <br> ) <br> ) |
| | ) |
| Defendants. | )    January 15, 2013 |
| _____ | ) |

14

15

16

17

18

Before the court is defendant Jain Irrigation, Inc.'s motion for partial summary judgment regarding plaintiff's tort claims and prayer for punitive damages (#86).[1]  Plaintiff opposed (#100) and defendant replied (#115).  The court has thoroughly reviewed the record and grants defendant Jain Irrigation, Inc.'s motion for partial summary judgment (#86).

19

## I. FACTUAL & PROCEDURAL BACKGROUND

20

21

22

23

24

25

In 2010, plaintiff Peri & Sons Farms, Inc. ("plaintiff") purchased irrigation drip tape to irrigate its commercial onion crop in Mason Valley, Nevada during the 2011 growing season (#86, p. 2).  Plaintiff ordered approximately 8,967 rolls of irrigation drip tape, which were manufactured by defendant Jain Irrigation, Inc. ("Jain") (#86, p. 2; #100, p. 3).  Plaintiff placed the order with defendant Agri-Valley Irrigation, Inc. ("Agri-Valley"), an independent distributor of Jain's products

26

27

28

_____

[1] Refers to the court's docket numbers.

(#86, p. 2).   Jain manufactured the irrigation drip tape and delivered it directly to plaintiff in Yerington, Nevada (#100, pp. 10, 20).[2]

Irrigation drip tape is similar to a flat tube and contains small openings known as "emitters." (#86, p. 2 fn. 1; #100, p. 4).   The drip tape is buried in the seed beds before planting.   After the onions are planted, irrigation water is pumped into the drip tape and exits the tape through the emitters, allowing for a designated rate of flow to irrigate the planted onions below the ground's surface.   *Id.*   Plaintiff alleges that the drip tape it received from Jain in 2011 was defective because the emitters, or slits in the drip tape, were misplaced so that the slits were blocked or partially blocked.   Thus, the drip tape failed to emit water at the designated rate and failed to sufficiently irrigate plaintiff's onion crops (#64, p. 23; #100, pp. 3, 21).   Plaintiff also alleges that Jain knowingly shipped drip tape which failed to satisfy Jain's written specifications and which should have been scrapped or at least set aside for further testing (#100, p. 14).[3]

Jain admits that portions of its irrigation drip tape contained slits that were blocked or partially blocked by the tape's glue seam due to a manufacturing defect and admits that those portions of the drip tape failed to function properly (#86, p. 2; #94, p. 8).   Jain also admits that the root cause of the manufacturing defect was machine instability at Jain's manufacturing facility in Watertown, New York (#94, p. 8).   However, Jain maintains that mitigation efforts were largely successful, and that plaintiff was able to harvest a good onion crop with only a small decrease in

---

[2] In 2009, Jain gave plaintiff two pallets of its low flow irrigation drip tape, as a sample, for limited field trials during the 2009 growing season (#100, p. 4).   In 2010, plaintiff expanded its field trials.   *Id.*   Plaintiff found that Jain's samples worked well and uniformly irrigated plaintiff's onion crop.   Plaintiff was also pleased with the drip tape's strength during installation.   *Id.* at 5.   Before plaintiff purchased Jain's irrigation drip tape for its entire 2011 onion crop, plaintiff asked if Jain could add an indicator stripe so that the workers who installed the tape could easily determine which side should face upward.   *Id.*   Jain advised plaintiff that a white stripe could be added to its irrigation drip tape to identify which side of the tape contained the emitters.   *Id.*

[3] Plaintiff contends that Jain operated its production machines at excessive speeds, and that Randy Vincent—the quality control supervisor at Jain's manufacturing facility—informed Jain's CEO and General Manager "that running the machines at a high rate of speed could produce problems in the tape" (*Deposition Testimony of Randy Vincent*, Ex. 3 to *Declaration of Brad M. Johnson*, at 75: 8-12).

quality compared to the previous two-year average, and with no decrease in overall pack-out yield compared to the previous two-year average.  *Id.*  Plaintiff asserts that it experienced a larger reduction in quality (misshaped or undersized onions), as well as a reduction in yield, each of which translated into lost profits, and that it also incurred mitigation expenses (#94, p. 8; #100, p. 23).

On May 21, 2012, plaintiff filed its First Amended Complaint, alleging the following claims: (1) breach of contract against Agri-Valley; (2) breach of the implied covenant of good faith and fair dealing against Agri-Valley; (3) breach of express warranty against Agri-Valley and Jain; (4) breach of the implied warranty of merchantability against Agri-Valley and Jain; (5) breach of the implied warranty of fitness for a particular purpose against Agri-Valley and Jain; (6) fraudulent concealment against Jain; (7) strict products liability against Jain; (8) negligence against Jain; (9) promissory estoppel against Jain; and (10) breach of oral contract against Jain (#64).

Jain has now filed a motion for partial summary judgment on plaintiff's tort claims (strict products liability, negligence, and fraudulent concealment) and on plaintiff's prayer for punitive damages (#86).  Jain opines that when a commercial product, such as irrigation drip tape, fails to function properly and causes anticipated damages—here, lost profits due to decreased onion quality and yield—the remedy lies in contract or warranty law, not tort law.  *Id.* at 3.  Jain asks the court to grant partial summary judgment in its favor on the grounds that: (1) the economic loss doctrine bars plaintiff's tort recovery; (2) plaintiff's fraudulent concealment claim fails as a matter of law because plaintiff and Jain did not have a "special relationship," and Jain had no duty to disclose its quality control information; and (3) plaintiff's prayer for punitive damages is not supported by plaintiff's remaining claims for relief (#86, p. 1).

Plaintiff asserts that this lawsuit is not "a run of the mill commercial case" involving a product which simply failed to work properly, but a case involving deceit (#100, p. 2).  Plaintiff

contends that Jain agreed to produce the specified irrigation drip tape in a "blatant attempt to profit from the intentional distribution of a defective product it cannot make." *Id.* Thus, plaintiff argues it is entitled to pursue its tort claims and prayer for punitive damages. *Id.* Specifically, plaintiff opposes Jain's motion for partial summary judgment on the grounds that: (1) the economic loss doctrine does not preclude plaintiff's tort claims (#100, pp. 24-34); (2) Jain represented that it could produce irrigation drip tape to meet plaintiff's specifications; Jain had a duty to disclose the problems and defects it experienced while manufacturing plaintiff's drip tape; plaintiff relied on Jain to specially manufacture the drip tape; Jain knew that plaintiff was relying on its representations; and plaintiff suffered damages as a result of Jain's fraudulent conduct (#100, pp. 34-38); and (3) plaintiff is entitled to pursue its prayer for punitive damages (#100, pp. 38-41).

## II. DISCUSSION & ANALYSIS

**A.     Legal Standards**

    **1. Summary Judgment**

    Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

    The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact

for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial.  *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.     Analysis**

As a preliminary matter, the court notes that it must apply the substantive law of Nevada.  Where the Nevada Supreme Court has not decided an issue, it is the task of this court to predict how the Nevada Supreme Court would resolve that issue.  *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986) (as amended).  In answering that question, this court may look to "well reasoned decisions from other jurisdictions."  *Id.*

**1.   Economic Loss Doctrine**

*Economic Loss Doctrine in Nevada*

"The economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of

reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Calloway v. City of Reno*, 116 Nev. 250, 256 (2000) (citation omitted), *overruled on other grounds by Olson v. Richard*, 120 Nev. 240, 241-44 (2004).   In the words of the United States Supreme Court, the economic loss doctrine exists to prevent contract law from drowning in a "sea of tort." *East River S.S. Corp. v. Transamerica Deleval*, 476 U.S. 858, 866 (1986).

    In Nevada, the economic loss doctrine bars unintentional tort claims when a plaintiff seeks to recover "purely economic losses."  *Calloway*, 116 Nev. at 257 (citing *American Law of Products Liability* (3d) § 60:39, at 69 (1991)); *Terracon Consultants Western, Inc. v. Mandalay Resort Group*, 125 Nev. 66, 73 (2009).   Thus, the doctrine provides that certain economic losses are properly remediable only in contract.  *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007).   Purely economic loss has been defined as "the loss of the benefit of the user's bargain . . . including . . . pecuniary damage for inadequate value, the cost of repair and replacement of the defective product, or consequent loss of profits, without any claim of personal injury or damage to other property."  *Calloway*, 116 Nev. at 257 (citing *American Law of Products Liability* (3d) § 60:36, at 66)).

    The purpose of the economic loss doctrine is to "shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus to keep the risk of liability reasonably calculable."  *Local Joint Executive Bd. of Las Vegas, Culinary Workers Union v. Stern*, 98 Nev. 409, 411 (1982).   "The doctrine expresses the policy that the need for useful commercial economic activity and the desire to make injured plaintiffs whole is best balanced by allowing tort recovery only to those plaintiffs who have suffered personal injury or property damage."  *Terracon*, 125 Nev. at 75 (citation omitted).   Thus, the "crux of the doctrine is . . . the premise that economic interests are protected, if at all, by contract

principles, rather than tort principles." *Calloway*, 116 Nev. at 260 (citation omitted).  Contract law seeks to enforce the expectancy interests created by the agreement between the parties and seeks to uphold standards of *quality*.  *Id.* (citation omitted).  Conversely, tort law is designed to secure the protection of all citizens from the dangers of physical harm to their persons or their property and seeks to uphold standards of *conduct*.[4]  *Id*.  "Tort law has not traditionally protected strictly economic interests related to product quality—in other words, courts have generally refused to create a duty in tort to prevent such economic losses."  *Id*.  Thus, the doctrine "is intended to maintain traditional limits on manufacturers' liability provided by the law of warranty . . .."  *Giles*, 494 F.3d at 873.

In *Giles*, the United States Court of Appeals for the Ninth Circuit described the economic loss doctrine as it relates to a products liability case:

> If a plaintiff is in a contractual relationship with the manufacturer of a product, the plaintiff can sue in contract for the normal panoply of contract damages, including foreseeable lost profits and other economic losses.  Whether or not the plaintiff is in a contractual relationship with the manufacturer, the plaintiff can sue the manufacturer in tort only for damages resulting from physical injury to persons or to property other than the product itself.

494 F.3d at 874.

Nevada indisputably applies the economic loss doctrine to bar strict products liability and negligence claims.  *See Stern*, 98 Nev. at 411-12 (employees of MGM Grand Hotel could not recover economic losses in the form of lost wages or employment benefits after hotel fire under

---

[4] As the *Calloway* court stated:

> A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement.  A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract.  Torts can, of course, be committed by parties to a contract.  The question to be determined . . . is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties.

116 Nev. at 256 (citing *Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 135 (1987)).

theories of strict products liability or negligence); *Central Bit Supply v. Waldrop Drilling*, 102 Nev. 139, 140-41 (1986) (purely economic loss due to faulty drill may be recovered under a breach of warranty theory—not a strict products liability or negligence theory); *Arco Products Co. v. May,* 113 Nev. 1295, 1299 (1997) (loss of convenience store sales from defective inventory control system could not be recovered under a strict products liability or negligence claim).  As for other tort claims, the *Calloway* court did not delineate the entire universe of tort claims that would, or would not, be subject to the economic loss doctrine.  Rather, the *Calloway* court found that "the more reasoned method" would be to examine each case "in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort."  116 Nev. at 261 fn. 3.

> *The Parties' Dispute*

The parties disagree about whether the economic loss doctrine bars plaintiff's tort claims for strict products liability, negligence and fraudulent concealment.  Jain contends that the economic loss doctrine bars plaintiff's tort recovery.  Plaintiff contends that the economic loss doctrine does not bar its tort recovery.

Jain asserts that if a commercial product, such as irrigation drip tape, fails to function properly, but does not cause personal injury or damage to "property other than the product itself," the buyer's legal remedy is to sue the manufacturer or distributor for breach of contract or breach of warranty (#86, p. 10).  Jain recognizes plaintiff's argument—that the irrigation drip tape damaged plaintiff's onion plants and that the onions are technically "property other than the product itself." *Id.* at 11.  However, Jain contends that plaintiff's alleged damages—lost profits due to reduced onion quality and yield—are not damages to "other property," but are the type of "purely economic losses" that the Nevada Supreme Court recognized in *Calloway*, and which are ordinarily recoverable in a breach of contract or breach of warranty action.  *Id.* at 11-12.  Jain argues that the sole function of

irrigation drip tape is to provide water and nutrients to a growing crop.  When the drip tape doesn't function properly, the expected damages are the precise damages plaintiff has alleged—reduced crop quality and reduced crop yield, resulting in lost profits.  *Id.* at 23.  Thus, Jain contends that the manufacturing defect in its irrigation drip tape frustrated plaintiff's expectancy interest in the product's quality, which was created by the agreement between the parties; and as such, plaintiff's remedy against Jain lies in contract or warranty law—not tort law.  *Id.* at 15.

Plaintiff asserts that when a defective product causes physical injury to a plaintiff's property, the economic loss doctrine does not apply, and tort remedies are available from the manufacturer for the resulting economic losses (#100, p. 24).[5]  Plaintiff argues that Jain correctly identifies two distinct categories of damages that can flow from its defective irrigation drip tape—purely economic damages, such as the cost to repair or replace the defective drip tape; and property damages (non-existent, undersized or misshaped onions) caused by the drip tape's failure to deliver sufficient water to plaintiff's growing onion crop.  *Id.* at 27, 30.  Plaintiff asserts that here, Jain's defective irrigation drip tape did not damage itself; but instead, damaged the onion plants that were already growing in plaintiff's fields.  *Id.* at 25.  Thus, plaintiff argues that the injury to its onions constitutes damage "to property other than the defective product itself," taking this case out of the economic loss doctrine's purview.[6]  *Id.* at 27.

### *Crop Damage as "Other Property"*

As discussed above, even though "purely economic losses" are not recoverable in strict products liability or negligence, when a defective product causes personal injury or damage to "other

---

[5] Plaintiff cites the Restatement (Third) of Torts: Prod. Liab. § 21 (1998), which provides:

> For purposes of this Restatement, harm to . . . property includes economic loss if caused by harm to: . . . . (c) the plaintiff's property other than the defective product itself.

[6] Plaintiff recognizes that its damages may ultimately be measured in terms of economic losses based on lost yield, lost quality, and lost sales, but states that the losses nevertheless stem from the injury to its property, i.e., its onions (#100, p. 34).

property," the economic loss doctrine does not apply and tort recovery may be permitted.  *Calloway*, 116 Nev. at 262; *Stern*, 98 Nev. at 410-12.  Thus, the main issue before the court is whether plaintiff has suffered "purely economic losses," precluding tort recovery by virtue of the economic loss doctrine, or damage to "other property," exempting plaintiff from the economic loss doctrine's application.  The court notes that the Nevada Supreme Court has not decided an economic loss doctrine case within the context of crop loss or damage.  Accordingly, both parties have cited numerous cases from other jurisdictions to inform the court's opinion.  After a thorough review of the applicable cases, the court concludes that plaintiff's alleged damages for lost profits caused by the failure of Jain's irrigation drip tape to work as expected, constitute "purely economic losses" as contemplated by the Nevada Supreme Court in *Calloway*.  Accordingly, the court finds that under Nevada law, plaintiff's tort claims for strict products liability and negligence are barred by the economic loss doctrine.

In *Prairie Production, Inc. v. Agchem Division—Pennwalt Corp.*, 514 N.E.2d 1299 (Ind.App.1987), the plaintiff, a seed growing company, purchased Penncap-M to kill corn earworms which were destroying its seed corn crop.  *Id.* at 1300.  However, the product failed to work as advertised and plaintiff lost a portion of its seed corn crop to the earworms.  *Id.*  Plaintiff sued the manufacturer for loss of profits from the ruined seed corn under a negligence theory.  *Id.*  The Indiana Court of Appeals, First District, found that the plaintiff's damage request constituted purely economic loss; and thus, the economic loss doctrine precluded the plaintiff's negligence claim.  *Id.* at 1304.  In reaching this conclusion, the court relied on *Seely v. White Motor Co.*, 63 Cal.2d 9, 18 (1965), which states:

> The distinction [between tort recovery and contract recovery] rests . . . on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products.  He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in

terms of conditions that create unreasonable risks of harm.  He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.

514 N.E.2d at 1304.  "Stated another way, a manufacturer does not owe a duty to avoid causing purely economic damage."  *Id*.  The court found that although the plaintiff suffered damage to its seed corn crop, the relevant inquiry was not *what* was damaged, but the *nature* of the damage.  *Id*.  The court concluded that because the plaintiff's negligence claim arose out of Penncap-M's failure to meet the plaintiff's business expectations, the plaintiff's lost profits would best be remedied under the provisions of the Uniform Commercial Code ("UCC").  *Id*. at 1304-05.  Accordingly, the plaintiff could not recover its lost profits under a negligence theory.  *Id*. at 1305.

In *Friedlein v. E.I. Du Pont de Nemours & Co.*, 68 F.Supp.2d 1061 (N.D. Iowa 1999), the plaintiffs applied Accent, an herbicide, to several of their corn fields.  *Id*. at 1062.  The plaintiffs alleged that the crop treated with Accent was stunted, produced shorter cornstalks, and produced unfilled ears of corn as a result of the treatment.  *Id*.  The Northern District of Iowa concluded that the diminution in crop value was a purely economic loss not recoverable in tort.  *Id*. at 1063.  In reaching this conclusion, the court reasoned that the plaintiffs' tort claims were based upon their commercial expectation that Accent would control unwanted grasses in the corn fields without damaging the emergent corn crop.  *Id*.  The court determined that the plaintiffs' claimed damages were based on the product's failure to perform; and thus, the losses were purely economic in nature and could not be recovered under the alleged tort theories.  *Id*.

Similarly, in *Nelson v. Todd's Ltd.*, 426 N.W.2d 120 (Iowa 1988), the plaintiff purchased a curing agent designed to preserve meat.  The product failed to work, resulting in meat spoliation.  *Id*. at 123.  The Iowa Supreme Court noted that although plaintiff's meat suffered harm of a physical nature due to the defendant's defective curing agent, the harm did not occur because the curing agent

damaged the meat in some active way, but because the product failed to work at all.  *Id.*  The *Nelson* court focused on the distinction between tort and contract law, much as the Nevada Supreme Court did in *Calloway*.  The *Nelson* court stated:

> We agree that the line to be drawn is one between tort and contract rather than between physical harm and economic loss. As we draw that line, the harm to Nelsons' meat falls on the contract-warranty side. The damage was the foreseeable result from a failure of the product to work properly because of a defect or omission from the product. When, as here, the loss relates to a consumer or user's disappointed expectations due to deterioration, internal breakdown or non-accidental cause, the remedy lies in contract. *See Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 84, 61 Ill.Dec. 746, 763, 435 N.E.2d 443, 450 (1982).
>
> Tort theory, on the other hand, is generally appropriate when the harm is a sudden or dangerous occurrence, frequently involving some violence or collision with external objects, resulting from a genuine hazard in the nature of the product defect. For example, had Quick Cure caused chemical burns to the Nelsons' hands or damaged their meat processing equipment, an action would lie in strict tort liability. That sort of harm could not have been reasonably anticipated by the contracting parties, and would be a hazard peripheral to the sale.

*Id.* at 125.  Thus, the court concluded that the trial court erred in submitting the plaintiff's strict products liability claim to the jury.  *Id.*

The courts in *Prairie Production*, *Freidlein*, and *Nelson* all found that the economic loss doctrine barred the plaintiffs' tort claims in situations where a defective product failed to work properly.  Importantly, in all three opinions, the courts focused on the fact that the defective product simply failed to perform as it should have, thereby failing to meet the purchasers' business expectations.  The courts concluded that the products' failure to meet business expectations caused crop losses, which resulted in lost profits, and that these types of claims were best suited to recovery in contract—not tort.

Here, plaintiff claims that Jain manufactured a defective product which caused physical damage to plaintiff's personal property, i.e., plaintiff's onions.  Plaintiff asserts that its onions are clearly distinct from the defective irrigation drip tape and thus constitute "other property," barring

application of the economic loss doctrine.  *See Calloway*, 116 Nev. at 273 (when a defective product causes personal injury or damage to "other property," the economic loss doctrine does not apply).  Plaintiff acknowledges that its damages are ultimately measured in terms of lost profits due to reduced onion quality and yield, but contends that the lost profits are not considered "purely economic losses," because they arise from damage to "other property."

However, the court finds that this case is factually analogous to *Prairie Production*, *Freidlein*, and *Nelson*.  Plaintiff's claim that Jain's defective irrigation drip tape physically damaged its onions is, in essence, a claim for lost profits similar to the claims in the three aforementioned cases.  Although plaintiff's onion crop is technically distinct from the underlying defective irrigation drip tape, the crop damage is directly related to the product's failure to perform as expected.  *See Bailey Farms v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994) (although the watermelon crop was technically "other property," crop losses caused by failure of the allegedly defective soil fumigant were found to be purely economic losses, as "a successful crop was part of the commercial expectations for the fumigant . . ..").

Because Jain's irrigation drip tape was partially defective, plaintiff failed to receive the benefit of its bargain.  The sections of the irrigation drip tape with blocked or partially blocked slits emitted less water.  This deficit allegedly resulted in a lower standard of onion quality than plaintiff expected.   Thus, like the plaintiffs in *Prairie Production*, *Freidlein*, and *Nelson*, the defective product's failure to work properly resulted in the consumer's disappointed expectations.  In such circumstances, the overriding policy of tort law—to promote safety—is not implicated.[7]   Instead, contract law is better suited to the nature of plaintiff's loss, i.e., lost profits due to decreased onion

---

[7] As the *Nelson* court stated, "[t]ort theory . . . is generally appropriate when the harm is a sudden or dangerous occurrence, frequently involving some violence or collision with external objects, resulting from a genuine hazard in the nature of the product defect." 426 N.W.2d at 125.  Here, there is nothing hazardous about defective irrigation drip tape.  The drip tape did not malfunction in a manner that was unforeseeable to the contracting parties.  Rather, the drip tape simply failed to function as bargained for, resulting in foreseeable damages.  *See id.*

quality and yield.  *See Fireman's Fund American Ins. Cos. v. Burns Electronic Sec. Services, Inc.*, 417 N.E.2d 131, 133-34 (Ill.App. 1980); *Terracon*, 125 Nev. at 79 ("[E]conomic losses for which no tort action will lie generally involve a buyer's disappointed economic expectations.") (citation omitted).

While this court acknowledges that several courts in other jurisdictions have found that crop damage constitutes damage to "other property," and have declined to apply the economic loss doctrine, *see Lesiak v. Central Valley Ag Co-op., Inc.*, 283 Neb. 103, 124 (2012), this court finds that the majority, if not all, of those cases are factually distinguishable from the current case.[8]

For example, plaintiff relies upon *E.I. Du Pont de Nemours & Co. v. Finks Farms, Inc.*, 656 So.2d 171 (Fla.App.1995), in which the plaintiff sprayed Benlate, a fungicide, on its tomato crop. Afterwards, the tomato plants developed a number of symptoms, including slow growth, stunting, small fruit, dull appearance, and reduced production.  *Id.* at 172.  The plaintiff sued the manufacturer to recover lost profits under tort theories of negligence and strict liability.  *Id.*  The Florida Court of Appeal, Second District, found that the plaintiff's claims were not precluded by the economic loss doctrine, as the fungicide had damaged "other property," i.e. the tomato plants and/or the land upon which it was sprayed.  *Id.*

Interestingly, in reaching this decision, the *E.I. Du Pont* court distinguished another Florida Court of Appeal case from the First District, *Monsanto Agric. Products Co. v. Edenfield*, 426 So.2d 574 (Fla.App.1982).  In *Monsanto*, a farmer purchased an herbicide to control weeds in his soybean crop.  The product did not work and the weeds stifled the soybean growth.  Unlike the court in *E.I. Du Pont*, the *Monsanto* court found that the herbicide manufacturer was not liable for negligence because the damage to the farmer's soybean crop was simply consequential damage caused by the

---

[8] In *Lesiak*, the plaintiffs alleged that their crops were harmed by over-application of an herbicide.  283 Neb. at 106.  The plaintiffs did not allege that the herbicide itself was defective.  283 Neb. at 106.

product's "ineffectiveness." 426 So.2d at 576.  The *E.I. Du Pont* court distinguished *Monsanto* by pointing out that Benlate was not "ineffective" for failing to kill fungus, but instead was "defective" because it directly harmed the tomato plants.  On that basis, the court determined that the economic loss rule did not apply and the plaintiff's tort claims could proceed.  656 So.2d at 173.

Unlike the fungicide in *E.I. Du Pont*, Jain's irrigation drip tape did not directly harm plaintiff's onion crop.  Instead, the drip tape indirectly damaged plaintiff's onions due to its "ineffectiveness."  Like the weeds in *Monsanto*, the direct source of harm to plaintiff's onion crop was insufficient water.  Accordingly, the basis upon which the *E.I. Du Pont* court premised its decision that the economic loss doctrine did not apply is inapposite to the facts in this case. *Compare Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 254 (1997) (relying on *E.I. Du Pont* to find that Benlate damaged "other property," i.e. plants, soil, and farm structures).

Likewise, in *Miidas Greenhouses, LLC v. Global Horticulture, Inc.*, 226 Ariz. 142 (Ariz.App.2010), the plaintiff purchased peat moss which was "too acidic for vegetable seed germination and cultivation of seedlings" and "lacked the native moisture content to enable it to absorb water."  *Id.* at 144.  As a result, the plaintiff's seeds and resulting crops were lost.  *Id.*  In determining whether the economic loss doctrine barred the plaintiff's tort claims, the court focused on three factors: (1) the nature of the product defect; (2) the manner in which the crop loss occurred; and (3) the type of loss or damage sustained.  *Id.* at 145.

In discussing the first factor—the nature of the product's defect—the court noted:

> The gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property.  On the other hand, contract law, which protects expectation interests, provides the appropriate set of rules when an individual wishes a product to perform a certain task in a certain way, or expects or desires a product of a particular quality so that it is fit for ordinary use.

*Id.* at 146 (citing *Salt River Project Agricultural Improvement & Power District v. Westinghouse Electric Corp.*, 143 Ariz. 368, 377 (1984)).  The court concluded that the peat moss "pos[ed] an unreasonable risk of harm to seeds and seedlings" because it destroyed them.  *Id.* at 146.  In considering the second factor—the manner in which the loss occurred—the court focused on the fact that the peat moss did not simply fail to meet the plaintiff's expectations that it would improve the seeds' germination rate, but rather, it actively destroyed the seeds so that they failed to germinate at all.  *Id.* at 147.  Finally, in analyzing the third factor—the type of damage sustained—the court noted that the Arizona Supreme Court had adopted a narrow version of the economic loss doctrine, which permitted a plaintiff to proceed in tort even absent damage to persons or other property.  *Id.*  The court concluded that the economic loss doctrine did not apply, and that tort recovery was appropriate because the seeds were clearly separate property from the peat moss and the peat moss posed an unreasonable risk of harm to the seeds.[9]  *Id.*

*Miidas* is clearly distinguishable from the current case.  When examining the nature of the product's defect, the *Miidas* court concluded that the peat moss did not simply fail to meet the plaintiff's business expectations, but rather "[p]osed an unreasonable risk of harm to seeds and seedlings" because the peat moss actively destroyed the seeds.  *Id.* at 146.  Here, Jain's irrigation drip tape did not actively or directly harm the onion crop, but simply failed to work as expected.  As stated previously, there was nothing about the irrigation drip tape itself which posed an unreasonable risk of harm to plaintiff's onion crop.  Thus, the policy reasons for allowing tort recovery are absent in this case.

Finally, both plaintiff and Jain cite two cases, *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128 (Tenn.1996), and *G&M Farms v. Funk Irrigation Co.*, 119 Idaho 514 (1991), to support their

---

[9] The *Miidas* court also relied on *E.I. Du Pont, Kawamata Farms*, and *Manning v. Int'l Harvester Co.*, 381 N.W.2d 376 (Iowa Ct.App.1985).

positions.  In both cases, the courts found that the economic loss doctrine barred the plaintiffs' tort claims.  However, this court finds that these decisions provide little guidance, as in both cases, the plaintiffs sued solely for economic losses resulting from lost profits and did not allege property damage.

In *Ritter*, the plaintiffs applied Frostguard to their tomato crops, which resulted in "extensive damage to their crops . . . thereby causing economic loss to the plaintiffs."  The Supreme Court of Tennessee noted that "[t]he distinction between damages for economic loss and damages for injury to property is not always clear."  912 S.W.2d at 130.  The *Ritter* court opined that "extensive damage to [the plaintiffs'] crops" suggested physical damage to property.  However, the court recognized that this question was not properly before it because the plaintiffs sued for "economic damages resulting from the lost profits"—not property damage.  *Id.*  Thus, the court found that the economic loss doctrine barred the plaintiffs' negligent misrepresentation claim.

Likewise, in *G&M Farms*, the plaintiff purchased an agriculture irrigation system which repeatedly malfunctioned, resulting in an insufficient water supply to G&M's crops.  The plaintiff filed an action alleging it had suffered economic loss in the form of a reduced crop yield.  However, the plaintiff did not allege property damage.  119 Idaho at 516 fn. 1.  The Idaho Supreme Court found that the plaintiff's claim constituted purely economic loss that could be recovered under the contract-based theory of the implied warranty of fitness for a particular purpose.  *Id.* at 527.  Thus, the court affirmed the trial court's dismissal of the plaintiff's negligent misrepresentation claim.  *Id.*

In summary, this court finds that plaintiff has suffered "purely economic loss," such that the economic loss doctrine bars plaintiff's strict products liability and negligence claims.  As noted above, in reaching this decision, the court relied upon persuasive authority from other jurisdictions.  However, the most compelling justification for this court's decision is rooted in Nevada case law.  In

*Calloway*, the Nevada Supreme Court determined whether the economic loss doctrine applied to bar a plaintiff's strict liability and negligence claims. The court focused on the type of damages at issue, and the policies underlying recovery in contract versus recovery in tort. 116 Nev. at 267. The court clearly stated that contract law is "designed to enforce the expectancy interests created by agreement between the parties and seeks to enforce standards of *quality*." *Id.* at 260. Whereas tort law is "designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property and seeks to enforce standards of *conduct*." *Id.*

Here, Jain's irrigation drip tape failed to work properly, causing consequential damage to plaintiff's onion crop. This failure frustrated plaintiff's business expectation that the drip tape would emit water at a specified rate, and resulted in decreases in crop quality and crop yield, causing economic damages in the form of lost profits. Under this factual scenario, the court concludes that contract law is best suited to remedy plaintiff's losses. Thus, the court finds that plaintiff's tort claims for strict products liability and negligence are barred by the economic loss doctrine. *See Calloway*, 116 Nev. at 271 (barring the plaintiffs' strict liability and negligence claims); *Stern*, 98 Nev. at 411-12 (barring the plaintiffs' strict products liability and negligence claims); *Central Bit Supply*, 102 Nev. at 140-41 (same); *Arco Products, Co.*, 113 Nev. at 1299 (same).

As for plaintiff's fraudulent concealment claim, the court cannot conclude that the economic loss doctrine would bar this claim under Nevada law. *See Calloway*, 116 Nev. at 267 (citing *Stern*, 98 Nev. at 411) ("a cause of action for an intentional tort is not precluded under the economic loss doctrine"); *Terracon*, 125 Nev. at 73 (citing *Stern*, 98 Nev. at 411 ("purely economic losses are recoverable in actions for tortious interference with contractual relations or prospective economic advantage when the alleged interference is *intentional*."); *see also Fuoroli v. Westgate Planet Hollywood Las Vegas, LLC*, 2011 WL 1871236, *5 (D.Nev. May 16, 2011) (not reported):

[T]he court cannot conclude that the economic loss rule would apply to bar [a fraudulent misrepresentation] claim under Nevada law. In *Terracon,* the Nevada Supreme Court interpreted the scope of Nevada's economic loss rule, concluding that it applies to bar only some "unintentional torts." 206 P.3d at 86. However, the court later noted that negligent misrepresentation, although an unintentional tort, poses a special financial harm and constitutes an exception to the economic loss doctrine. *Id.* at 88. Logic thus dictates that a claim for fraudulent misrepresentation, an intentional tort, would also constitute an exception to the rule.[10]

The Ninth Circuit has recognized that Nevada may bar tort recovery for claims other than strict products liability and negligence "where the plaintiff's only complaint is that the defendant failed to perform what was promised in the contract." *Giles*, 494 F.3d at 879. However, the *Calloway* court did not delineate the entire universe of tort claims that would, or would not, be subject to the economic loss doctrine.[11] This court declines to do so, and finds such analysis unnecessary for the reasons stated below.

## 2. Fraudulent Concealment

To prevail on a claim for fraudulent concealment, the plaintiff must prove: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff—that is, the defendant concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than he would have if he had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression, the plaintiff sustained damages. *Nevada Power Co. v. Monsanto Co.*, 891 F.Supp. 1406, 1415 (D.Nev. 1995).

---

[10] The court cites *Fuoroli* in compliance with the rules of this circuit. *See* Ninth Circuit Rule 36-3(c)(ii).
[11] The *Calloway* court found that "the more reasoned method" would be to examine each case "in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort." 116 Nev. at 261 n. 3.

Generally, an action in deceit will not lie for nondisclosure.  *Id.* (citing *Epperson v. Roloff*, 102 Nev. 206, 213 (1986)).  "For a mere omission to constitute actionable fraud, a plaintiff must first demonstrate that the defendant had a duty to disclose the fact at issue."  *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 1486 (1998), *overruled on other grounds by GES, Inc. v. Corbitt*, 117 Nev. 265 (2001).  Here, absent such a duty, Jain's failure to disclose any problems it may have had in the manufacture of its irrigation drip tape and/or the quality of the drip tape would not constitute actionable fraud.

In Nevada, the duty to disclose arises from the relationship between the parties.  *Id.*  A duty to disclose arises where there is a fiduciary relationship or where there is a "special relationship," such that the complaining party imparts special confidence in the defendant and the defendant reasonably knows of that confidence.  *Id.*  The Nevada Supreme Court has recognized such a "special relationship" between real estate agents/buyers, insurers/insureds, trustees/beneficiaries, and attorneys/clients, such that "[n]ondisclosure . . . become[s] the equivalent of fraudulent concealment."  *Nevada Power Co.*, 891 F.Supp. at 1416 n.3 (citing cases); *Giles*, 494 F.3d at 881 (citing *Mackintosh v. Jack Matthews & Co.*, 109 Nev. 628, 634-35 (1993)).  However, simply manufacturing or selling an alleged defective product is not enough to support the required relationship.  *See generally Dow Chem. Co.*, 114 Nev. at 1487; *Nevada Power Co.*, 891 F.Supp. at 1416 n.3.  As stated in *Nevada Power Co.*:

> [T]his court is not convinced that any such "special relationship" existed between the parties here.  This was nothing more than a straightforward commercial transaction between two corporations for the purchase of electrical equipment.  The relationship here, such as it was, was simply that of vendor-vendee.

891 F.Supp. at 1416 n.3.

Jain asserts that it is entitled to summary judgment in its favor with respect to plaintiff's fraudulent concealment claim because Jain owed plaintiff no duty to disclose whether it experienced difficulty manufacturing plaintiff's irrigation drip tape (#86, p. 20).  Jain contends that plaintiff cannot transform its ordinary vendor-vendee relationship with Jain into a "special relationship," simply because Jain's Kevin Stewart advised plaintiff that the irrigation drip tape would suit plaintiff's needs and that it could be manufactured with a white stripe (#86, pp. 22-23; #86, Ex. 7, *Deposition of Kevin Stewart*, 149:24-151:11).[12]

Plaintiff asserts that Jain knew about the defects in its irrigation drip tape before it shipped the product (#100, p. 3).[13]  Plaintiff contends that Jain had a duty to disclose: (1) that it had decided to discontinue manufacturing irrigation drip tape with an indicator stripe; (2) that adding an indicator stripe made the drip tape more difficult to manufacture and increased the risk of blocked slits; and (3) that Jain experienced problems and witnessed defects in manufacturing the drip tape in this litigation (#100, pp. 34-35).  Plaintiff also contends that a jury should determine whether a "special relationship" existed between the parties; and that here, a rational juror could find a "special relationship" because plaintiff relied upon Jain to manufacture its irrigation drip tape with an indicator stripe.  *Id.* at 38; *see e.g., Giles*, 494 F.3d at 881 ("[T]he existence of the special relationship is a factual question . . ..").

---

[12] Jain alleges that the addition of a white stripe did not transform its irrigation drip tape into a custom product or render it otherwise unique (#86, p. 22).  Jain's Territory Sales Manager Stephen Johnson testified: "This—this is part of our product offering . . . I had a part number, an eight-digit part number.  I think this is something we've made before.  I don't think this is something we tooled up to specifically make for David Peri" (#86, Ex. 14, *Deposition of Stephen Johnson*, 34:3-16).  Kevin Stewart also noted that Jain's predecessor company had manufactured similar drip tape with a green stripe for other growers (#86, Ex. 7, *Deposition of Kevin Stewart*, 201:17-202:7); and Jain also shipped 600 rolls of drip tape from the same production run which produced plaintiff's tape to another customer (#86, Ex. 8, *Deposition of Aric Olson*, 96:17-25).

[13] During the manufacturing process, Jain would remove a sample from each roll of irrigation drip tape, inspect the sample, and document the results in an inspection log (#94, p. 6).  Generally, every fifth sample was subjected to a flow test.  *Id.*  If a sample failed to meet Jain's written specifications, the roll of drip tape from which the sample was taken should have been scrapped or set aside for further inspection (#100, p. 14; *Deposition of Randy Vincent*, 13:6-14:3, marked as Exhibit 3 to the *Declaration of Brad M. Johnson*).

To prevail on its fraudulent concealment claim, plaintiff must prove that the parties entered into a "special relationship" giving rise to Jain's duty to disclose.  *Nevada Power Co.*, 891 F.Supp. at 1415.  Plaintiff argues that a "special relationship" arose because Jain informed plaintiff that it could manufacture irrigation drip tape with an indicator stripe, and plaintiff relied upon Jain to manufacture working drip tape.  The court finds plaintiff's assertions insufficient to establish a "special relationship."  Jain manufactured the irrigation drip tape, which defendant Agri-Valley sold to plaintiff.  The fact that Jain told plaintiff that it could make irrigation drip tape with an indicator stripe does not elevate their association beyond a "straightforward vendor-vendee relationship," which as a matter of law, creates no fraud-based duty to disclose.  *See Nevada Power Co.*, 891 F.Supp. at 1417.  Because plaintiff cannot show support for an element that is essential to its cause of action, it cannot withstand Jain's motion for summary judgment on the fraudulent concealment claim.[14]   Accordingly, Jain's motion for partial summary judgment is granted as to plaintiff's fraudulent concealment claim.

### 3.  Punitive Damages

N.R.S. 42.005(1) provides that a litigant may recover punitive damages "in an action for the breach of an obligation not arising from contract" if the litigant can prove by clear and convincing evidence that the defendant engaged in "oppression, fraud or malice, express or implied . . .."[15]   In other words, punitive damages are only available for tort claims in which "oppression, fraud or

---

[14] Even if plaintiff could prove that a "special relationship" existed between plaintiff and Jain, the court finds that Jain was under no duty to disclose that, for business reasons, Jain had previously decided to discontinue manufacturing drip tape with an indicator stripe.  Jain was also under no duty to disclose that it was more difficult to manufacture irrigation drip tape with an indicator stripe than without one.  Finally, Jain was under no duty to disclose the problems it encountered when manufacturing plaintiff's irrigation drip tape or affirmatively present its quality control data for plaintiff's perusal.  Plaintiff has cited no authority to the contrary.

[15] "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person."  N.R.S. 42.001(4).  "Fraud" entails "intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person."  N.R.S. 42.001(2).  "Malice, express or implied" is defined as "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others."  N.R.S. 42.001(3).

malice, express or implied" can be proven by clear and convincing evidence.  Punitive damages are not available under Nevada law for contract-based causes of action.  *See Rd. & Highway Builders, LLC v. N. Nev. Rebar, Inc.*, 284 P.3d 377, 383 (2012) (citing *Amoroso Const. v. Lazovich and Lazovich*, 107 Nev. 294, 298 (1991) (punitive damages are not available for breach of contract claims); *Frank Briscoe Co., Inc. v. County of Clark*, 643 F.Supp. 93, 99-100 (D.Nev. 1986) (contract-based breach of warranty claim cannot support an award of punitive damages).

This court concludes that plaintiff's tort claims for strict products liability, negligence, and fraudulent concealment fail as a matter of law.  Thus, plaintiff's request for punitive damages also cannot stand.  Accordingly, Jain's motion for partial summary judgment is granted as to plaintiff's prayer for punitive damages.

### III.  CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that plaintiff has no legally cognizable tort claims in light of the economic loss doctrine, the lack of a "special relationship" between the parties or an accompanying duty to disclose, and the evidence in this case. As such, plaintiff's tort claims for strict products liability, negligence, and fraudulent concealment fail as a matter of law.

**IT IS THEREFORE ORDERED** that Jain's motion for partial summary judgment (#86) be **GRANTED**.

**IT IS SO ORDERED.**

**DATED:** January 15, 2013.

_____

**UNITED STATES MAGISTRATE JUDGE**